
# IN THE SUPREME COURT OF GUAM

## THE PEOPLE OF GUAM,
Plaintiff-Appellee,

### v.

## ELIGIO ADRIATICO,
Defendant-Appellant.

Supreme Court Case No. CRA22-004
Superior Court Case Nos. CF0116-84; CF0085-83

## OPINION

## Cite as: 2024 Guam 7

Appeal from the Superior Court of Guam
Argued and submitted on February 28, 2024
Hagåtña, Guam

Appearing for Defendant-Appellant:
Stephen P. Hattori, *Esq.*
Public Defender
Public Defender Service Corporation
779 Rte. 4
Sinajana, GU 96910

Appearing for Plaintiff-Appellee:
Daniel G. Morris, *Esq.* (argued)
Nathan M. Tennyson, *Esq.* (briefed)
Marianne Woloschuk, *Esq.* (briefed)
Office of the Attorney General
590 S. Marine Corps Dr., Ste. 901
Tamuning, GU 96913



**E-Received**
12/13/2024 4:23:35 PM

BEFORE: ROBERT J. TORRES, Chief Justice; F. PHILIP CARBULLIDO, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**TORRES, C.J.:**

[1]      Defendant-Appellant Eligio Adriatico appeals from the Superior Court's denial of his post-conviction motion for relief. Adriatico sought compassionate release because of the COVID-19 pandemic or, alternatively, the correction of illegal sentences. We affirm the trial court's denial of compassionate release. We also correct Adriatico's life-without-parole ("LWOP") sentences for attempted aggravated murder. At the time of his sentencing, Guam law did not permit LWOP for attempted aggravated murder.

[2]      The merits of Adriatico's cruel-and-unusual-punishment claim raise several important Organic Act issues. Adriatico asks this court to find that mandatory LWOP for "youthful offenders" is cruel and unusual punishment. We hold, like other jurisdictions in the United States, that the federal Constitution acts as a floor in Guam and not a ceiling. The Organic Act Bill of Rights serves as a second layer of protection that can be greater than the U.S. Constitution. We find that the Ninth Circuit's decision in *Guam v. Guerrero*, 290 F.3d 1210 (9th Cir. 2002), is unsupported by law, and we depart from it.

[3]      The history of the Organic Act Bill of Rights does not support reading 48 U.S.C.A. § 1421b(h)'s prohibition of cruel and unusual punishments as coextensive with the Eighth Amendment. Having concluded that we are not bound to interpret the Organic Act Bill of Rights in lockstep with federal courts' interpretation of the Constitution, we still find federal decisions interpreting analogous provisions to be persuasive. Courts should depart from federal jurisprudence only when adequate grounds exist for the departure. Here, Guam's distinctive characteristics support departure from federal Eighth Amendment jurisprudence.

**[4]**     We remand for further proceedings, with instructions to appoint counsel and hold an evidentiary hearing on how evolving science on brain development applies to an emerging adult and to Adriatico's specific circumstances.  After hearing, the trial court shall decide whether imposition of mandatory LWOP sentences for youthful offenders violates Guam's evolving standards of decency that mark the progress of a maturing society.

**[5]**     We affirm in part, reverse in part, and remand for further proceedings.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

**[6]**     Adriatico was born on December 1, 1962.  This appeal deals with convictions from two separate cases in the early 1980s.  The first case stemmed from incidents that occurred between September 28 and October 4, 1983.  Adriatico was twenty years old when he and co-defendant Romeo P. Marquez were convicted by a jury of several counts,[1] including aggravated murder, after engaging "in a crime spree that left seven people dead and ten seriously injured."  *People v. Marquez*, DCA Crim. Nos. 84-00036A, 84-00037A, 1986 WL 68899, at *1 (D. Guam App. Div. Oct. 24, 1986); Record on Appeal ("RA") CF0085-83, tab 4 at 1–2 (Judgment, May 21, 1984).  For his two aggravated murder convictions, the Superior Court of Guam sentenced Adriatico to the statutorily mandated life sentences without parole.  That prosecution was captioned CF0085-83.  Less than three months later, Adriatico and Marquez were charged with shooting four inmates at the Department of Corrections, leaving two dead and two permanently injured.  Adriatico was convicted of two counts of aggravated murder and two counts of attempted aggravated murder,

---

[1] In this first case, Adriatico was convicted of two counts of Aggravated Murder, one count of Attempted Aggravated Murder, five counts of Murder, one count of Aggravated Assault, two counts of Assault, one count of Robbery in the Second Degree, and two counts of Possession and Use of a Deadly Weapon in the Commission of a Felony.  Record on Appeal CF0085-83 ("RA CF0085-83"), tab 4 at 1–2 (Judgment, May 21, 1984).  On direct appeal, the District Court of Guam Appellate Division reversed one deadly-weapon-special-allegation conviction while affirming the remaining convictions.  *People v. Marquez*, DCA Crim. Nos. 84-00036A, 84-00037A, 1986 WL 68899, at *4–6 (D. Guam App. Div. Oct. 24, 1986).

receiving four more LWOP sentences.[2]  Adriatico was twenty-one years old at the time of the prison shooting.  This prosecution was captioned CF0116-84.

[7]      Adriatico was then transferred to a federal prison to serve his Guam sentence.  He does not dispute his legal culpability.  *See* Appellant's Pro Se Br. at 11 (Aug. 9, 2022) ("It is undisputed that appellant committed the underlying crimes in his youthful years.").  Adriatico has been in federal custody at USP Atwater, a high security U.S. Penitentiary in California, for nearly 40 years.

[8]      Although Adriatico was sentenced for several convictions,[3] most relevant to this appeal are his six LWOP sentences: two for aggravated felony murder in the initial crime spree, two for aggravated murder in the prison shooting, and two for attempted aggravated murder in the latter shooting.  Only the four LWOP sentences imposed for aggravated murder were mandatory under 9 GCA § 16.30(b).

[9]      In 2021, Adriatico filed a motion in the Superior Court for compassionate release based on the threat of COVID-19 and for sentence reduction on the theory that scientific developments regarding brain development indicate LWOP sentences for youthful offenders are cruel and unusual.  Adriatico claimed that USP Atwater provided him with no access to Guam law materials and asked the court to appoint him counsel.  The Superior Court exercised jurisdiction over

---

[2] Adriatico was also convicted of four counts of Possession and Use of a Deadly Weapon in the Commission of a Felony.

[3] In the initial prosecution, Adriatico received five additional life sentences for Murder, fifteen years for Attempted Aggravated Murder, three years for Aggravated Assault, two years for Assault, ten years for Second Degree Robbery, and twenty-five years (with three years of parole) for Possession and Use of a Deadly Weapon in the Commission of a Felony.  *Cf. Marquez*, 1986 WL 68899, at *6 (vacating Adriatico's second deadly-weapon special allegation).  In the prison shooting case, he received four additional sentences of twenty-five years for Possession and Use of a Deadly Weapon in the Commission of a felony.  These sentences were ordered to run as follows: (1) twenty-five years for use of a deadly weapon (which has now been served); (2) the nine other sentences for the initial crimes (including two LWOP sentences and five life sentences) are then to be served, which run concurrently together; (3) the four LWOP sentences from the prison shooting are to be served next, and they run concurrently together; (4) finally, the four sentences of twenty-five years each for use of a deadly weapon, which run consecutive to each other.  Thus, considering the sentences that run concurrently, in the aggregate, Adriatico was sentenced to serve 125 years plus two life sentences without parole.

Adriatico's motion and held a hearing where Adriatico appeared telephonically from USP Atwater, representing himself.

[10]    While the motion was under advisement, Adriatico requested the court take judicial notice of the U.S. Sentencing Commission's 2017 Report on youthful offenders.[4]  Adriatico also mailed a *pro se* supplemental brief to the Superior Court arguing that because the "[U.S.] Supreme Court [has] accepted neurological evidence on adolescent brain development, the sentencing landscape has changed significantly in both state and federal laws."  RA CF0085-83, tab 27 at 3–4 (Suppl. Br., May 12, 2022) (citing *Graham v. Florida*, 560 U.S. 48 (2010); *Miller v. Alabama*, 567 U.S. 460 (2012); *Montgomery v. Louisiana*, 577 U.S. 190 (2016)).

[11]    The Superior Court denied Adriatico's motion on the merits.  The court concluded that although Guam has no compassionate release statute, Adriatico did not meet "his burden of showing that there are 'extraordinary and compelling reasons' to justify his immediate release," and that "[e]ven if the Court found an 'extraordinary and compelling reason' exists, it could still deem compassionate release not warranted based on a review of the factors set forth in [18 U.S.C.A. §] 3553(a)."  RA CF0085-83, tab 24 at 8–9 (Dec. & Order, May 5, 2022).  The court ultimately found that Adriatico had not shown that the "significant amount of time" he has spent in prison was "sufficient given the seriousness of the offenses committed."  *Id.* at 9.

---

[4] This is the term used in the federal sentencing guidelines and literature on the subject, which defines a "youthful offender" as one aged 18-25.  This generally coincides with Guam's definition of a "youth offender," with the notable difference being Guam's definition excludes offenders convicted of crimes punishable by life imprisonment.  9 GCA § 83.15(d) (2005).  Although Guam's Youth Correction Act was enacted in 1965, it has never been implemented.  *See People v. Chargualaf*, Crim. No. 88-00068A, 1989 WL 265040, at *7 (D. Guam App. Div. Sept. 26, 1989) ("The Act was created in 1965 by Public Law 8–49 but has never been implemented.  Rules necessary to carry out the intent of the Act and to enable the [Guam] Parole Board to exercise powers and duties under the Act were never executed.  Additionally, no Director of the Department of Corrections has ever certified that proper and adequate treatment, facilities, and personnel have been provided under the Act." (first citing 9 GCA Ch. 83, Refs. & Annos.; then citing 9 GCA § 83.30; and then citing 9 GCA § 83.45)); *Borja v. Bitanga*, 1998 Guam 29 ¶ 21 ("[T]he rehabilitation goals of the Act cannot be accomplished at this time because the Act has never been implemented.  Sentencing under the Act is an impossibility.").

**[12]**    The court further found that because "Adriatico does not set forth that his sentences in either CF0085-83 or CF0116-84 were illegal. . . . a reduction of sentence is inappropriate under [8 GCA §] 120.46." *Id.* at 5.  It concluded that "[a]lthough Adriatico sets forth that the Court should consider more recent developments in scientific evidence and case law indicating leniency for young offenders under the age of twenty-five, the Court does not find that such developments are appropriate for consideration under compassionate release.  Further, the sentencing of a defendant under Guam law is not subject to federal sentencing guidelines." *Id.* at 9.

**[13]**    Adriatico timely appealed.

## II.  JURISDICTION

**[14]**    This court has jurisdiction over appeals from the Superior Court of Guam under 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 118-137 (2024)) and 7 GCA §§ 3107 and 3108(a) (2005).  This court has appellate jurisdiction over a post-judgment order affecting a defendant's substantial rights.  8 GCA § 130.15(c) (2005); *see also People v. McKinney*, 2018 Guam 10 ¶ 8.  This court previously found in a written order that it had jurisdiction over the merits of this appeal.  Order (Mar. 10, 2023).  We concluded that the Superior Court can properly exercise its general jurisdiction to consider post-conviction motions if they are not explicitly barred by statute.  *Id.* at 3 (citing *People v. Habib*, 2010 Guam 9 ¶ 8; *Carter v. State*, 2015 UT 38, ¶ 18, 345 P.3d 737; *State v. Mundo-Parra*, 462 P.3d 1211, 1213–14 (Kan. Ct. App. 2020); 24 C.J.S. *Criminal Procedure and Rights of Accused* § 2097); *see also Carter*, 2015 UT 38, ¶ 19 n.4.

**[15]**    We also concluded, "Under Guam law, an illegal sentence can be corrected by motion at any time," *id.* at 4 (citing 8 GCA § 120.46 (2005); *People v. Mallo*, 2008 Guam 23 ¶¶ 6, 9; *Habib*, 2010 Guam 9 ¶ 15), and "[a] sentence that violates the Eighth Amendment's prohibition of cruel and unusual punishment is quintessentially an illegal sentence," *id.* (citing *Montgomery*, 577 U.S.

at 195). We will exercise jurisdiction over the merits of an appeal challenging the denial of a motion to correct an illegal sentence when the defendant makes a colorable claim that the sentence violates their constitutional rights. *See McKinney*, 2018 Guam 10 ¶ 10; *cf. People v. Torres*, 2008 Guam 26 ¶ 13; *Northern Mariana Islands v. Delos Santos*, 2020 MP 16 ¶ 6. After oral argument, we requested supplemental briefing on whether the law at the time of Adriatico's sentencing authorized an LWOP sentence for Attempted Aggravated Murder and whether such a sentence was mandatory, among other things. Order at 2 (Mar. 1, 2024).

### III. STANDARD OF REVIEW

[16]     The legality of a sentence is reviewed *de novo*. *McKinney*, 2018 Guam 10 ¶ 9. This court reviews constitutional and Organic Act issues *de novo*. *People v. Guerrero*, 2000 Guam 26 ¶ 5.

### IV. ANALYSIS

#### A. Adriatico's Compassionate-Release Argument Has Been Abandoned on Appeal

[17]     The People argue that although Adriatico requests that this court remand the matter with instructions to treat the motion for compassionate release as a habeas petition, "he gives no justification for doing so." Appellee's Br. at 10 (Aug. 18, 2023). The People continue, "This court has already held that the lower court had jurisdiction to decide the defendant's motion, and the lower court exercised its jurisdiction and issued a decision on the motion." *Id.* Adriatico did not file a reply brief. At oral argument, Adriatico's appellate counsel conceded that he was abandoning the compassionate-release argument. Digital Recording at 10:07:32–10:08:18 (Oral Arg., Feb. 28, 2024). Because Adriatico has abandoned his compassionate-release argument, we affirm the trial court's denial of that part of his motion. *See Kim v. Min Sun Cha*, 2020 Guam 22 ¶ 20 ("We have held in prior cases that a party may abandon an argument on appeal by explicitly conceding an issue, or by failing to include any argument or discussion in his or her brief." (citations omitted)).

**B. We Correct Adriatico's LWOP Sentences for Attempted Aggravated Murder**

[18]   An illegal sentence may be corrected at any time. *See* 8 GCA § 120.46; *McKinney*, 2018 Guam 10 ¶ 10. Adriatico argues that mandatory LWOP sentences for youthful offenders constitute cruel and unusual punishment. Appellant's Br. at 2 (July 7, 2023). Adriatico also argues that the law at the time of his sentencing did not authorize LWOP for attempted aggravated murder. Appellant's Suppl. Br. at 4 (Nov. 27, 2023) (arguing that at the time of his convictions, the maximum sentence for a first-degree felony was 20 years).

[19]   "An illegal sentence is 'a sentence that is not authorized by the judgment of conviction or that is greater or less than the permissible statutory penalty for the crime.'" *McKinney*, 2018 Guam 10 ¶ 10 (quoting *Mallo*, 2008 Guam 23 ¶ 13). "In determining the plain meaning of a statutory provision, we look to the meaning of the entire statutory scheme containing the provision for guidance." *Amerault v. Intelcom Supp. Servs., Inc.*, 2004 Guam 23 ¶ 14.

[20]   Guam's attempt statute, which has not been amended since its enactment in 1976, makes attempted murder a first-degree felony. *Compare* Guam Crim. & Corr. Code § 13.60(b) (1977), *with* 9 GCA § 13.60(b) (as recodified by Guam Pub. L. 15-104:8 (Mar. 5, 1980)). It does not explicitly address attempted *aggravated* murder, but under subsection (a), "attempt . . . [is a] crime[] of the same grade and degree as the most serious crime which is attempted." *Id.* § 13.60(a). Because aggravated murder is a felony of the first degree under 9 GCA § 16.30(b), attempted aggravated murder is also a first-degree felony. At the time of Adriatico's conviction, Guam law provided that a person convicted of a first-degree felony could be sentenced to "not less than five (5) years and not more than twenty (20) years." 9 GCA § 80.30(a) (as recodified by P.L. 15-104:8). But "[i]n the case of a felony of the first degree," a felon could be sentenced to an extended term of "life imprisonment" if the court found they were a repeat offender pursuant to 9 GCA §

80.38. 9 GCA § 80.32(a) (as recodified by P.L. 15-104:8); 9 GCA § 80.38 (as recodified by P.L. 15-104:8). At the time, no law expressly permitted a defendant to be sentenced to LWOP for attempted aggravated murder. In 2003, we struck down section 80.38 as unconstitutional in *People v. Muritok*, 2003 Guam 21 ¶ 47.

[21] Yet the People argue that "a discretionary sentence of life without parole may [have been] entered subject to the fulfillment of necessary factors [of 9 GCA § 80.32]." Appellee's Suppl. Br. at 16 (Apr. 19, 2024). However, at the time of Adriatico's conviction, the law provided that "[u]nless otherwise provided by law, every person confined in a [Guam] penal or correctional institution shall be eligible for release on parole . . . ." 9 GCA § 80.72(a) (as recodified by P.L. 15-104:8); *see also People v. Moses*, 2007 Guam 5 ¶ 47 ("Under Guam law, a sentence of imprisonment always has a possibility of parole, unless the sentence specifically states that it is a sentence without the possibility of parole."). Additionally, where the Guam legislature has authorized LWOP sentences, it has done so expressly. *See, e.g.*, 9 GCA § 25.15(b)–(c) (as amended by P.L. 36-101:3 (June 15, 2022)) (First Degree Criminal Sexual Conduct); 9 GCA § 25.25(c) (as amended by P.L. 36-101:5) (Third Degree Criminal Sexual Conduct); 9 GCA § 67.401.4(b) (as amended by P.L. 35-005 (Apr. 4, 2019)) (Prison Terms for Drug Offenders, repeat offenders); 9 GCA § 67.401.9(b)(2) (as amended by P.L. 32-163 (May 23, 2014)) (Importation and Exportation Penalties, repeat offenders). Although section 80.32 allowed trial courts at the time to impose a life sentence, it did not specifically state such sentences were without the possibility of parole. Because the law at the time of Adriatico's conviction did not expressly provide for LWOP for attempted aggravated murder, we conclude that it was not "otherwise provided by law." *See* 9 GCA § 80.72(a).

[22]     Based on the plain language of the statutory sentencing scheme at the time of Adriatico's conviction, the maximum penalty allowed by statute for Adriatico's commission of attempted aggravated murder was a life sentence *with* the possibility of parole.  In light of our decision in *Muritok* that section 80.38 is unconstitutional, we hold that the maximum sentence that Adriatico could have received for a conviction of attempted aggravated murder was "20 years of imprisonment.  *Cf. People v. Tedtaotao*, 2015 Guam 9 ¶¶ 9–26 (reaching this conclusion for attempted murder), *overruled in later appeal*, 2015 Guam 31 ¶¶ 26–27, 57 (vacating Tedtaotao's attempted murder conviction on other grounds).  We exercise our authority under 8 GCA § 120.46 to correct Adriatico's LWOP sentences for the two counts of attempted aggravated murder in CF0116-84 to 20 years of incarceration for each count, "to be served concurrently to each other and consecutive to that sentence . . . being served by [Adriatico] in [CF0085-83] . . . ."  *See* RA CF0116-84, tab 1 at 2 (Judgment, Nov. 21, 1984).

## C. This Court Can Interpret the Organic Act's Bill of Rights to Provide Greater Protections than Federal Interpretations of Analogous Language Found in the U.S. Constitution

[23]     Although Eighth Amendment claims have been infrequently litigated, the former District Court of Guam Appellate Division opined in *People v. Sablan* that a mandatory life sentence did not constitute cruel and unusual punishment.  Crim. No. 76-05A, 1978 WL 13493, at *1 (D. Guam App. Div. Mar. 3, 1978) (citing *People v. Root*, 524 F.2d 195, 197 (9th Cir. 1975)).[5]  Whether a sentence inflicts cruel and unusual punishment is an issue of first impression in this court.

[24]     The Ninth Circuit case of *Guam v. Guerrero* looms over this issue.  *Guerrero* stands for the proposition that where the Organic Act Bill of Rights and U.S. Constitution have "substantively

---

[5] The Appellate Division's reliance on *People v. Root* seems to have been misplaced, as the Ninth Circuit made no discussion of mandatory life sentences.  *See generally Root*, 524 F.2d 195, 197 (9th Cir. 1975) (discussing the felony-murder rule).  In addition to being decided more than thirty years before the U.S. Supreme Court's Eighth Amendment trilogy of *Roper*, *Graham*, and *Miller*, the *Sablan* decision is unpersuasive here because there is no distinction between life sentences with or without parole.

identical language," this court cannot interpret the Organic Act in a different manner from the U.S. Supreme Court's interpretation of the Constitution. *People v. Moses*, 2016 Guam 17 ¶¶ 20–21 (quoting *Guerrero*, 290 F.3d at 1217–18); *see also United States v. Drake*, 543 F.3d 1080, 1085 (9th Cir. 2008) (interpreting Speedy Trial Clause in the Organic Act as coterminous with federal Constitution because "[t]he language of the Speedy Trial Clause in the Organic Act tracks its federal counterpart almost exactly" (citing *Guerrero*, 290 F.3d at 1217–18)).  If we are to reach the merits of the mandatory LWOP for aggravated murder issue, we must address *Guerrero*—either following it or departing from it because it is unsupported by law.

[25]    We hold that *Guerrero* is unsupported by law, and this court has the authority to depart from it.  As the court of last resort for Guam, this court is empowered to independently and definitively interpret provisions of the Organic Act Bill of Rights.

### 1.  The Ninth Circuit's decision in *Guerrero*

[26]    We have summarized the procedural history of *Guerrero* as follows:

> Guerrero, a Rastafarian, was convicted of importing marijuana into Guam, which he used in his religious practices.  In considering this case on appeal, we had ruled that the Free Exercise Clause in the Organic Act was more protective than the federal version, safeguarding Guerrero's religious practices.  On appeal to the Ninth Circuit, Guerrero maintained he was shielded by two layers of protection: the Organic Act's Bill of Rights, "subject to final construction by [this court], and a federal Bill of Rights, subject to final construction by the U.S. Supreme Court."  He argued that subsection (u) of the Mink Amendment is "a floor below which the Guam legislature cannot dip," whereas the standalone provision is analogous to a state constitution, and should be interpreted more broadly.

*Moses*, 2016 Guam 17 ¶ 20 (alteration in original) (citations omitted).

[27]    The Ninth Circuit in *Guerrero* made several contentions about Guam and the Organic Act that merit discussion.[6]  The court determined that "Guam's 'Bill of Rights,' . . . is a federal statute

---

[6] The tone of the opinion departs from previous Ninth Circuit opinions about the territories.  *Compare Guerrero*, 290 F.3d at 1212-18, *with Wabol v. Villacrusis*, 958 F.2d 1450, 1462 (9th Cir. 1990) ("The Bill of Rights

dealing with an issue of *federal constitutional import*, not a local law." *Guerrero*, 290 F.3d at 1214 (emphasis added). It observed, "In response to renewed petitions of Guam's inhabitants, Congress enacted the Organic Act of 1950, 48 U.S.C. § 1421 *et seq.*, which, *inter alia*, established a 'Bill of Rights' modeled after the Bill of Rights in the federal Constitution, 48 U.S.C. § 1421b." *Guerrero*, 290 F.3d at 1214. It noted, however, that "Guam's 'Bill of Rights' is patterned after, but not identical to, the federal Bill of Rights." *Id.* at 1214 n.6. The court recognized the general

---

was not intended to interfere with the performance of our international obligations. Nor was it intended to operate as a genocide pact for diverse native cultures."). Beyond the dismissive attitude towards Guam, the statements in *Guerrero* that Guam has no inherent right to govern itself and enjoys only those rights conferred to it by Congress largely miss the point. The Ninth Circuit wrote of Guam as an abstract area of land ("territory" not in the technical legal sense, but the general one). *See, e.g.*, Julian Aguon, *On Loving the Maps Our Hands Cannot Hold: Self-Determination of Colonized and Indigenous Peoples in International Law*, 16 Asian Pac. Am. L.J. 47, 68 (2011) ("[T]he people of Guam are, essentially, non-people. . . . Guam's international personality as a non-self-governing territory aside, Guam is, under U.S. domestic law, an unincorporated territory."). But we cannot ignore the people who actually live here. *Id.* at 65, 68 ("Compounding the interpretive violence done to the text of the U.S. Constitution in the name of the colonial enterprise is the psychic violence inflicted on folks who must find our way in a country that neither wants us nor wants to let us go. . . . So we are Americans in name, not right.").

To whatever extent the conclusion that "Guam . . . enjoy[s] only those rights conferred to it by Congress," *Guerrero*, 290 F.3d at 1217, might be technically correct, it ignores the right of Guam's people to self-government that is enshrined in the text of America's founding document, as the supreme law of the land, and in international law. The Declaration of Independence para. 2 (U.S. 1776) ("We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness."); U.S. Const. art. VI, cl. 2. (providing treaties are supreme law of land); G.A. Res. 2625 (XXV), at 123 (Oct. 24, 1970) ("By virtue of the principle of equal rights and self-determination of peoples enshrined in the Charter of the United Nations, all peoples have the right freely to determine, without external interference, their political status and to pursue their economic, social and cultural development, and every State has the duty to respect this right . . . ."); International Covenant on Civil and Political Rights, art. 1, para. 1, Dec. 16, 1966, 999 U.N.T.S. 171 ("All peoples have the right of self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development."). If the Ninth Circuit is to be taken at face value, sovereignty is not derived from the people, but from how the area of land they inhabit is characterized by the federal judiciary. The Tenth Circuit has the better view:

> [A] basic principle of republican association [is] that "governments . . . deriv[e] their [] powers from the consent of the governed. . . . Respect for this principle should be at its zenith in the case of territories born from American imperial expansion, a project that was always in significant tension with our aspirations toward representative democracy. "The fabric of American empire ought to rest on the solid basis of the consent of the People." We have sometimes failed to live up to Hamilton's admonition. It is for this reason "that sovereignty and membership need to be reconceptualized in less rigid terms if we are to establish a political regime that overcomes historical subordination and justly rules over the territory *and inhabitants* of the United States."

*Fitisemanu v. United States*, 1 F.4th 862, 879 (10th Cir. 2021) (third, fourth, and fifth alterations in original) (emphasis added) (citations omitted); *see also Guam v. Olsen*, 431 U.S. 195, 208 (1977) (Marshall, J., dissenting) ("[W]e should not eviscerate the court system carefully devised by the people of Guam in the exercise of their right of self-government.").

proposition established by the United States Supreme Court in the Insular Cases[7] that "[w]ith the exception of certain 'fundamental rights,' federal constitutional rights do not automatically apply to unincorporated territories." *Id.* at 1214 (citing *Balzac v. Porto Rico*, 258 U.S. 298, 312–13 (1922); *Dorr v. United States*, 195 U.S. 138, 147 (1904)). The court also acknowledged that "in 1968, Congress enacted 48 U.S.C. § 1421b(u), known as the Mink Amendment, which extended certain constitutional rights to Guam 'to the extent that they [had] not been previously extended' and provided that those rights '*shall have the same force and effect* [in Guam] as in the United States or in any State of the United States.'" *Id.* (alterations in original).

[28] As framed by the *Guerrero* court, the "thorny question" they were tasked with deciding was "whether § 1421b(a) is analogous to the free exercise provisions found in many state constitutions that state supreme courts are free to interpret as providing more protection than that given by the federal constitution." *Id.* at 1215. They reasoned the issue before them was "whether the rights established in the federal Constitution are a ceiling beyond which the Supreme Court of Guam cannot exceed when it is interpreting its 'Bill of Rights.'" *Id.*

[29] As the court found the language of the Free Exercise Clause of the Organic Act "virtually identical to its federal counterpart," it observed that if the federal Constitution imposed a ceiling, the Guam Supreme Court would be bound by the U.S. Supreme Court's decision in *Employment Division v. Smith*. *Id.* at 1214–16 (citing *Emp. Div. v. Smith*, 494 U.S. 872 (1990)) (denying free exercise protections to members of Native American Church). The Ninth Circuit rejected the argument that § 1421b provided an additional layer of constitutional protection. *Id.* at 1216, 1218.

---

[7] "Best known as the Supreme Court decisions that held that the Constitution did not 'follow the flag' to the islands annexed by the United States after the Spanish-American War--the Philippines, Puerto Rico, and Guam--the Insular Cases famously gave judicial sanction to American imperialism at the turn of the twentieth century." Christina Duffy Burnett, *Untied States: American Expansion and Territorial Deannexation*, 72 U. Chi. L. Rev. 797, 798–99 (2005).

Consistent with this court's holding, Guerrero had argued that the Mink Amendment extended the federal Bill of Rights to Guam as a floor, whereas the other provisions of the Guam Bill of Rights were analogous to provisions found in a state constitution. *Id.* at 1216. This would have meant that although this court was bound by the interpretation the U.S. Supreme Court gives the constitutional provisions extended to Guam by the Mink Amendment, it was free to interpret other provisions of § 1421b more broadly to provide greater protections than the federal Constitution. *Id.* The Ninth Circuit stated:

> Of course, Guam is not a state, has no locally adopted constitution, and its "Bill of Rights" was passed not by its citizens, but rather by Congress. While § 1421b might function as a constitution, it remains quite unlike a constitution of a sovereign State. Guam is a federal instrumentality, enjoying only those rights conferred to it by Congress, and its "Bill of Rights" is a federal statute. Not even a sovereign State may interpret a federal statute or constitutional provision in a way contrary to the interpretation given it by the U.S. Supreme Court. We are powerless to delegate authority to the Supreme Court of Guam to interpret matters of federal law in a manner other than that provided by the federal judiciary.

*Id.* at 1216–17 (citation omitted). The Ninth Circuit concluded that the Free Exercise Clause of the First Amendment operated as a ceiling in Guam, and that this court's interpretation of the Free Exercise Clause in the Guam Organic Act was bound by the U.S. Supreme Court's decision in *Smith*. *See id.* at 1216–18.

[30] To justify its conclusion that the federal Constitution operated as a ceiling, the Ninth Circuit cited cases it explicitly acknowledged treated the federal Constitution as a floor. *Id.* at 1217 (citing *Kepner v. United States*, 195 U.S. 100, 123–24 (1904); *Weems v. United States*, 217 U.S. 349 (1910); *United States v. Husband R. (Roach)*, 453 F.2d 1054, 1058 (5th Cir. 1971); *S. Porto Rico Sugar Co. v. Buscaglia*, 154 F.2d 96, 100 (1st Cir. 1946); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366, 1370 (9th Cir. 1992)). The court admitted that all these cases "involved situations where the local territorial court interpreted its statutory bill of rights to

provide *less* protection of individual rights than that found in the federal Constitution," as opposed to the Supreme Court of Guam which found "its 'Bill of Rights' to provide *greater* protection of individual rights." *Id.* at 1217. Undeterred by this clear distinction between the interpretation offered by the Supreme Court of Guam and those rejected in the cited cases, the Ninth Circuit inexplicably stated, "[W]e nevertheless find their principle controlling. These cases teach us that a territorial court lacks the authority to interpret a federal statute or federal constitutional provision contrary to the interpretation the U.S. Supreme Court has given it."[8] *Id.* at 1217–18.

[31] The court, in a footnote, dismissed the argument that its interpretation made parts of the Mink Amendment redundant and superfluous. Guerrero had asked, "If subsection (u) was merely extending rights that had *not previously been extended*, and subsection (a) *already provided the federal level of free exercise protection*, why did Congress mention the First Amendment *again* in subsection (u)?" *Id.* at 1218 n.11. Ignoring the Insular Cases and basic canons of construction, the court offered a textualist justification that cannot be described as anything but mere *ipse dixit*: "Had Congress wanted to add a separate layer of constitutional protections, simpler language would have sufficed, for example, 'in addition' or 'also.' In any case, subsection (u) adds only those provisions *not already extended*. Therefore, if a provision had been extended, like free exercise of religion, it was not duplicated by subsection (u)." *Id.*

[32] The court held that it "was error for the Supreme Court of Guam to conclude that '[d]espite the similarity of the two provisions, [the Guam Supreme Court] can reach its own conclusions on the scope of the protections of section 1421b(a) and may provide broader rights than those which

---

[8] Nowhere else in the United States where a constitutional provision applies does it operate this way. *See, e.g.*, *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) ("[T]he Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard."); 16 C.J.S. *Constitutional Law* § 13 (May 2024 Update); *see also In re Individuals in Custody of State*, No. SCPW-21-0000483, 2021 WL 4762901, at *16 n.13 (Haw. Oct. 12, 2021) (McKenna, J., dissenting) ("Even if our language was identical to the federal Constitution, we are able to provide greater protection under the Hawaiʻi constitution." (citing *State v. Lopez*, 896 P.2d 889, 901 (Haw. 1995))).

have been interpreted by federal courts under the United States Constitution.'" *Id.* at 1218 (first alteration in original).

### 2. Why *Guerrero* is unsupported by law

[33]     The Organic Act was amended in 2004 to end certiorari review of our decisions by the Ninth Circuit, making this court equal to the other branches of government and courts of last resort in almost every other U.S. jurisdiction. Act of Oct. 30, 2004, Pub. L. No. 108-378, § 2, 118 Stat. 2206, 2208 (codified at 48 U.S.C.A. § 1424-2). This court clarified in *Underwood v. Guam Election Commission* that "[u]nder the principles of *stare decisis* as they exist in American jurisprudence, we do not regard the termination of the Ninth Circuit review as a termination of the precedential value of cases involving Organic Act issues that rose to the Ninth Circuit through . . . the local court appellate process during the Ninth Circuit review period." 2006 Guam 17 ¶ 35. But this court emphasized:

> [B]ecause the Supreme Court of Guam is now the final arbiter of questions arising through the jurisdiction of the courts of Guam (short of final *certiorari* review by the United States Supreme Court), we recognize our authority to depart from Ninth Circuit cases interpreting the Organic Act of Guam only in the rare instance where we believe that such cases are unsupported by law.

*Id.*

[34]     The Ninth Circuit's *Guerrero* decision has been harshly criticized, including by the Supreme Court of the U.S. Virgin Islands ("USVI"), which observed that "the reasoning of *Guerrero* was 'based neither on text, nor on congressional intent, nor on precedent.'" *See Balboni v. Ranger Am. of the V.I., Inc.*, 70 V.I. 1048, 1065 n.16 (2019) (quoting Christopher Serkin & Nelson Tebbe, *Is the Constitution Special?*, 101 Cornell L. Rev. 701, 736 (2016)). In *Balboni*, the USVI Supreme Court held that it is "empowered to independently and definitively interpret the Bill of Rights provisions of the Revised Organic Act as the court of last resort for the Virgin

Islands." *Id.* at 1060.  Although we do so on slightly different grounds,[9] we agree with the USVI

Supreme Court's conclusion that "[t]o the extent that the *Guerrero* decision is not inconsistent

with the United States Supreme Court's later decision in *Limtiaco v. Camacho*, 549 U.S. 483, 491

(2007), it is not apposite." *Id.* at 1065 n.16.  A critical flaw in the reasoning of the Ninth Circuit's

*Guerrero* opinion is that it rests on several false assumptions: that the similarity of a statute's text

---

[9] The USVI Supreme Court emphasized that the Ninth Circuit decided *Guerrero* "without any analysis of the legislative history." *Balboni v. Ranger Am. of the V.I., Inc.*, 70 V.I. 1048, 1065 n.16 (2019).  It found the legislative history of the USVI Bill of Rights to be dispositive:

> Congress did not model the Virgin Islands Bill of Rights after the Bill of Rights to the United States Constitution.  Rather, the legislative history reveals that Congress modelled the Virgin Islands Bill of Rights after similar provisions found in state constitutions, which state courts of last resort have virtually-uniformly interpreted as conferring greater rights than those in the Bill of Rights to the United States Constitution.  And while the Virgin Islands Bill of Rights was enacted by Congress, it was not enacted pursuant to the general and enumerated powers vested in Congress in its capacity as a national legislature through Article I of the United States Constitution.  Instead, Congress enacted the Revised Organic Act as the organic governing law or constitution for the Virgin Islands through its power under the Territorial Clause of Article IV of the United States Constitution, which effectively authorizes Congress to enact laws for a territory as if Congress were a state government.  Congress, having also directed that the relationship between the courts of the Virgin Islands and the courts of the United States to mirror the one between state and federal courts, consequently intended for this Court to exercise the power to interpret the Virgin Islands Bill of Rights in the same manner that a state court of last resort may interpret the Bill of Rights to a state constitution.

*Id.* at 1061.

The dissent in *Balboni* criticized the majority for placing much emphasis on the statement of one senator in the congressional record that the USVI Bill of Rights adopted "familiar provisions found in various organic acts and in State constitutions in relation to the Bill of Rights." *Id.* at 1116–17 (Cabret, J., dissenting).  Neither party has located any analogous statement in the legislative history of the Guam Organic Act.  But although our decision can be rooted on stronger bases, the history of the Guam Congress Walkout does suggest the people of Guam played a pivotal role in the passage of the Organic Act, including shaping the legislation eventually passed by Congress. *See, e.g.*, Leo Babauta, *Guam Congress Walkout*, Guampedia, https://www.guampedia.com/guam-congress-walkout/ (last visited Dec. 2, 2024); Anne Perez Hattori, *Righting Civil Wrongs: The Guam Congress Walkout of 1949*, 3 ISLA: A Journal of Micronesian Studies 1, 19 (Rainy Season 1995) ("In passing their own version of an organic act for Guam, the members of the Guam Congress sought to identify the walkout as a clear call for US citizenship and civil government . . . .").  Specifically, this legislative history indicates the Organic Act Bill of Rights was meant to be an enaction of the Bradley Bill of Rights, which was proposed by the Naval Governor in 1930.  Penelope C. Bordallo, *A Campaign for Political Rights on Guam, Mariana Islands, 1899-1950* (Aug. 1982) (M.A. thesis, Univ. Hawai'i) (Scholar Space) (discussing draft Organic Act passed by the Guam Congress that guaranteed the Bradley Bill of Rights); *Bill of Rights for Guam 1930*, Guampedia, https://www.guampedia.com/bill-of-rights-for-guam-1930/ (last visited Dec. 2, 2024).  Although ultimately vetoed by the Secretary of the Navy, the Bradley Bill of Rights was intended as a law of purely local concern. *See Bill of Rights for Guam 1930*, Guampedia ("[B]y virtue of the power and authority vested in me as Governor of Guam, and in recognition of the loyalty and unswerving allegiance of the people of Guam to the Government of the United States of America and to its ideals of freedom and democracy, I declare that the following articles shall have full force and effect of law in the Island of Guam . . . ." (quoting Bradley Bill of Rights, Proclamation)).  Thus, our conclusion is also supported by the legislative history of the Guam Organic Act Bill of Rights.

makes it automatically coextensive with the Constitution; that 48 U.S.C.A. § 1421b(a) and the First Amendment are the same provision of law; and that the Mink Amendment was surplusage. We address each of these flawed assumptions in turn.

### a. Similarity of language does not render a statute automatically coextensive with the Constitution

[35]    First, the *Guerrero* court assumed that where a "federal statute" uses language that is "virtually identical" to the federal Constitution, the statute must be coextensive with the Constitution because it "deal[s] with an issue of federal constitutional import." *Guerrero*, 290 F.3d at 1214. But this is simply not the case. This assumption is not based in precedent, as the U.S. Supreme Court has outlined the analysis to determine whether a federal statute is coextensive with a constitutional provision. In *Kastigar v. United States*, the Court outlined this analysis in the context of whether a federal immunity statute was coextensive with the Fifth Amendment privilege against self-incrimination: "The constitutional inquiry, rooted in logic and history, as well as in the decisions of this Court, is whether the immunity granted under this statute is coextensive with the scope of the privilege." 406 U.S. 441, 449 (1972); *see also Childs v. McCord*, 420 F. Supp. 428, 431 (D. Md. 1976) (applying *Kastigar*, stating, "The legislative history of this statute clearly reveals a congressional intent that a 'statutory (claim of immunity) . . . be as broad as, but no broader than, the privilege against self-incrimination.'"), *aff'd sub nom. Childs v. Schlitz*, 556 F.2d 1178 (4th Cir. 1977). A federal statute may be coextensive with a constitutional amendment, but this is not automatic; rather, the congressional intent must be clear.

[36]    The proper analysis does not end with the superficial similarity of language between the statute and the Constitution, but also looks to the similarity of purpose between the constitutional principle and the statute, along with the statute's legislative history. The inquiry of the *Guerrero* court was rooted in neither logic, history, nor precedent. Rather, it purported to create a new

category of federal statute that is automatically coextensive with the Constitution: a federal statute that "deal[s] with an issue of federal constitutional import." *Guerrero*, 290 F.3d at 1214. This categorization had never been invoked by any other federal court before and has never been since.

### b. The First Amendment and 48 U.S.C.A. § 1421b(a) are different provisions of law

[37]     Another issue that the *Guerrero* decision ignores is that 48 U.S.C.A. § 1421b(a) and the First Amendment are different provisions of law. At the risk of stating the obvious, a federal statute and a constitutional amendment are two different things. As the U.S. Supreme Court has said, "[T]he Organic Act is a federal statute, which we are bound to construe according to its terms." *Limtiaco*, 549 U.S. at 492. But this is not mere pedantry; this is a distinction with a difference—construing subsection (a) of the Organic Act Bill of Rights and construing the First Amendment are two different things. Like any other court, this court is bound by the U.S. Supreme Court's interpretation of a federal law. But it does not follow that when the Court construes a constitutional provision, it is cabining all federal statutes that deal with that "issue of federal constitutional import." *Contra Guerrero*, 290 F.3d at 1214.

[38]     This distinction should have been obvious to the *Guerrero* court, because at issue there was the Religious Freedom Restoration Act of 1993 ("RFRA")—a federal statute Congress explicitly passed to provide greater religious protections than the Supreme Court recognized under the First Amendment. *See Ramirez v. Collier*, 595 U.S. 411, 424 (2022) (stating RFRA was passed in the aftermath of *Smith* and aims to ensure greater protection for religious exercise than is available under the First Amendment). Although RFRA has had a troubled history from its passage,[10] it still applies to the federal government. *See, e.g.*, *Ajaj v. Fed. Bureau of Prisons*, 25 F.4th 805, 807–08

---

[10] It was found unconstitutional as applied to the States. *City of Boerne v. Flores*, 521 U.S. 507 (1997); *see also Holt v. Hobbs*, 574 U.S. 352, 356–58 (2015) (summarizing RFRA's history).

(10th Cir. 2022) ("RFRA prohibits the federal government from substantially burdening an individual's exercise of religion unless the application of that burden is the least restrictive means of furthering a compelling governmental interest."). It would be nonsensical to state that any decision of the U.S. Supreme Court interpreting the Free Exercise Clause invalidates laws explicitly passed by Congress to provide additional statutory protections of religious exercise. *See, e.g.*, *United States v. Bauer*, 84 F.3d 1549, 1558–59 (9th Cir. 1996) (observing that "[t]he power of Congress to provide federal protection in addition to that accorded by the great guarantees of the Bill of Rights has been exerted in other contexts," and collecting examples of federal statutes passed by Congress to free religious orders from the impact of Supreme Court decisions). When the Supreme Court issues a constitutional ruling, it does not invalidate every tangentially related federal statute that provides greater protection than the Bill of Rights. *See, e.g.*, *In re Young*, 141 F.3d 854, 860 (8th Cir. 1998) ("Congress has often provided statutory protection of individual liberties that exceed the Supreme Court's interpretation of constitutional protection. . . . Congress need not agree with everything the Supreme Court does in order for its legislation to pass constitutional muster . . . .").

[39]     The U.S. Supreme Court has stated it will "accord deference" to decisions of this court "over matters of purely local concern." *Limtiaco*, 549 U.S. at 491. If the U.S. Supreme Court ultimately interprets a provision of 48 U.S.C.A. § 1421b(a)–(t) differently, we will be bound by that interpretation—but the Court has yet to do so. *See Underwood*, 2006 Guam 17 ¶ 34 (observing any split between this court and federal courts can be resolved by U.S. Supreme Court). The false equivalency between a federal statute that "deal[s] with an issue of federal constitutional import" and a constitutional provision works a sleight of hand. It turns the technically correct statement that "[n]ot even a sovereign State may interpret a federal statute or constitutional provision in a

way contrary to the interpretation given it by the U.S. Supreme Court," *Guerrero*, 290 F.3d  at 1217, into the plainly incorrect holding that "[n]ot even a sovereign State may interpret a federal statute [that deals with an issue of federal constitutional import] in a way contrary to the interpretation given [the related constitutional provision] by the U.S. Supreme Court."

[40]    State courts routinely make independent determinations of federal statutes, *see, e.g.*, *Boucher v. All. Title Co.*, 25 Cal. Rptr. 3d 440, 443 (Ct. App. 2005) ("In the absence of controlling United States Supreme Court decisional authority, we make an independent determination of federal law."); *State v. Burnett*, 755 N.E.2d 857, 862 (Ohio 2001) ("[W]e are not bound by rulings on federal statutory or constitutional law made by a federal court other than the United States Supreme Court.  We will, however, accord those decisions some persuasive weight."), even when they deal with an issue of "federal constitutional import," *see, e.g.*, *Wendella Sightseeing Co. v. City of Chicago Through Dep't of Fin.*, 2023 IL App (1st) 211371, ¶ 52 ("Because our analysis involves interpretation of the RHA, a federal statute, and tangentially, the tonnage clause as contained within our federal constitution, we may look to 'decisions of the United States Supreme Court and federal circuit and district courts' for guidance."), *appeal denied sub nom. Wendella Sightseeing Co. v. City of Chicago*, 221 N.E.3d 333 (Table) (Ill. 2023).

[41]    Even when a federal statute is modeled after and shares similar language with a constitutional provision, the *Guerrero* court was wrong to assume the statute must be interpreted in lockstep with the Constitution.  Nowhere is this highlighted more than in relation to the Indian Bill of Rights, codified as part of the Indian Civil Rights Act (ICRA) at 25 U.S.C.A. § 1302.  As the U.S. Supreme Court has observed, ICRA "accorded a range of procedural safeguards to tribal-court defendants 'similar, but not identical, to those contained in the Bill of Rights and the

Fourteenth Amendment.'" *United States v. Bryant*, 579 U.S. 140, 149 (2016) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 57 (1978)).

[42]     The contention by the *Guerrero* court that a sovereign cannot interpret a federal statute differently from how the U.S. Supreme Court interprets the Constitution is demonstrably false; courts of sovereign tribal nations routinely interpret ICRA differently than the U.S. Supreme Court interprets analogous constitutional provisions. *See, e.g.*, *Navajo Nation v. Rodriguez*, 8 Nav. R. 604 (Navajo 2004) ("In giving meaning to the right against self-incrimination, this Court does not have to directly apply federal interpretations of the Bill of Rights. In interpreting the Navajo Bill of Rights and the Indian Civil Rights Act, as with other statutes that contain ambiguous language, we first and foremost make sure that such interpretation is consistent with the Fundamental Laws of the Din[é]."). Despite ICRA stating, "No Indian tribe in exercising powers of self-government shall . . . deprive any person of liberty or property without due process of law," 25 U.S.C.A. § 1302(a)(8) (Westlaw through Pub. L. 118-107 (2024)), the Eighth Circuit has held that "the equal protection clause of the ICRA is not coextensive with the equal protection clause of the [F]ourteenth [A]mendment to the United States Constitution," *Wounded Head v. Tribal Council of Oglala Sioux Tribe of Pine Ridge Rsrv.*, 507 F.2d 1079, 1082 (8th Cir. 1975) (citations omitted).

[43]     Nearly 50 years ago, the Ninth Circuit recognized:

> [T]he courts have been careful to construe the terms "due process" and "equal protection" as used in the Indian Bill of Rights with due regard for the historical, governmental and cultural values of an Indian tribe. As a result, these terms are not always given the same meaning as they have come to represent under the United States Constitution.

*Tom v. Sutton*, 533 F.2d 1101, 1104 n.5 (9th Cir. 1976) (citing *Howlett v. Salish & Kootenai Tribes of Flathead Rsrv.*, 529 F.2d 233 (9th Cir. 1976); *McCurdy v. Steele*, 506 F.2d 653 (10th Cir. 1974);

*O'Neal v. Cheyenne River Sioux Tribe*, 482 F.2d 1140 (8th Cir. 1973); *Groundhog v. Keeler*, 442 F.2d 674 (10th Cir. 1971)).

[44] Thus, while the Indian Bill of Rights is a federal statute—that was modeled on the U.S. Constitution and shares similar language with it—courts are unanimous in holding that they are not coextensive. The contention of the *Guerrero* court that a federal statute that deals with an issue of federal constitutional import must be treated as coextensive with the analogous constitutional provision is simply unmoored from settled law.

[45] Adriatico's appeal centers on the Organic Act's prohibition of "cruel and unusual punishments," 48 U.S.C.A. § 1421b(h), and it is not the case these words must be interpreted to be coextensive with the Eighth Amendment. As for ICRA's prohibition on cruel and unusual punishment, courts have found that they "should not merely look at the construction of the Eighth Amendment to the United States Constitution." *E.g.*, *Ramos v. Pyramid Tribal Ct., Bureau of Indian Affs.*, 621 F. Supp. 967, 970 (D. Nev. 1985); *see also Swinomish Tribal Cmty. v. 2002 BMW*, 17 Am. Tribal Law 235, 238 (Swinomish 2022) (stating that although persuasive, federal Eighth Amendment jurisprudence not binding on Tribal Court).

### c. The plain text of the Mink Amendment shows Congress contemplated a two-tiered system of rights with the federal Constitution setting a floor

[46] The Ninth Circuit's comments about the Mink Amendment are unmoored from the statutory text, territorial jurisprudence, and canons of statutory interpretation. The Mink Amendment extended to Guam, *inter alia*, the first nine amendments to the Constitution "to the extent that they have not been previously extended to that territory." 48 U.S.C.A. § 1421b(u). The *Guerrero* court recognized it was reasonable to read this phrase as "provid[ing] Guam two layers of religious protection, one federal and one subject to local interpretation that cannot fall beneath the floor of federally protected rights." *Guerrero*, 290 F.3d at 1218 n.11. Yet it rejected this

interpretation by assuming—without justification—the statutory language was a reference to the Organic Act Bill of Rights and not the doctrine of territorial incorporation. *See id.* ("In any case, subsection (u) adds only those provisions *not already extended*. Therefore, if a provision had been extended [by the Organic Act], like free exercise of religion, it was not duplicated by subsection (u).").

[47]    Whatever the virtue or vices of the Insular Cases, the *Guerrero* court cited them in its decision and accurately characterized one of their central holdings to be: "With the exception of certain 'fundamental rights,' federal constitutional rights do not automatically apply to unincorporated territories." 290 F.3d at 1214 (citing *Balzac*, 258 U.S. at 312–13; *Dorr*, 195 U.S. at 147); *see also Downes v. Bidwell*, 182 U.S. 244, 249 (1901) (holding the revenue clauses of the Constitution did not "extend of their own force to our newly acquired territories"); *Pueblo v. Casellas Toro*, 2017 TSPR 63, 197 D.P.R. 1003, 97 P.R. Offic. Trans. 52 ("Through the so-called Insular Cases, the federal Supreme Court held that only the rights classified as fundamental rights under the Constitution of the United States extend of their own force to nonincorporated territories, such as Puerto Rico." (citing *Downes*, 182 U.S. 244)). The obvious implication is that, under settled law when the Mink Amendment was passed, certain federal constitutional rights *extended* of their own force to Guam. It is against this backdrop that the Mink Amendment's extension of certain federal constitutional provisions must be read; any jurist familiar with the Insular Cases understands this.[11]

[48]    The plain text of the Mink Amendment illustrates that the original provisions of the Organic Act Bill of Rights restricted the civil government of Guam. *See* 48 U.S.C.A. § 1421b(u)

---

[11] As has recently been written, "The *Insular Cases* impact the everyday lives of the peoples of the territories in far-reaching ways--from the political to the economic, and the social to the cultural." Susan K. Serrano & Ian Falefuafua Tapu, *Reparative Justice in the U.S. Territories: Reckoning with America's Colonial Climate Crisis*, 110 Cal. L. Rev. 1281, 1288 (2022).

("The following provisions of and amendments to the Constitution of the United States are hereby extended to Guam to the extent that they have not been previously extended to that territory and shall have the same force and effect there as in the United States or in any State of the United States . . . ."). Although some federal constitutional provisions extended to Guam of their own force because they were fundamental rights, certain "provisions of and amendments to the Constitution of the United States" could only be extended to Guam by legislation. *See id.* The phrase "to the extent that they have not been previously extended to that territory," *id.*, can be interpreted only as a reference to the central holding of the Insular Cases—some fundamental rights enshrined in the U.S. Constitution already applied in Guam by their own force. The statement that the provisions extended to Guam "shall have the same force and effect there as in the United States or in any State of the United States," *id.*, can only logically be interpreted to mean Congress intended these constitutional provisions to operate in Guam like they do everywhere else in the country—setting a floor below which the government (both local and federal) could not go.

[49]     "When Congress amends legislation, courts must presume it intends the change to have real and substantial effect." *Van Buren v. United States*, 593 U.S. 374, 393 (2021) (quoting *Ross v. Blake*, 578 U.S. 632, 641–42 (2016)). Read against the background of law Congress was legislating against, and presuming Congress intended the amendment to have real and substantial effect, the plain text of the Mink Amendment contemplated a two-tiered system of rights—as exists in nearly every other jurisdiction in the United States. A textualist reading of that amendment that comes to any other conclusion is intellectually disingenuous. *See Balboni*, 70 V.I. at 1069 ("To hold otherwise would render the 1968 amendment to the Revised Organic Act extending the Fourteenth Amendment to the Virgin Islands completely superfluous."); *Guam v. Inglett*, 417 F.2d

123, 124 (9th Cir. 1969) ("[A]ll of the statutory language may be given effect by interpreting [subsection (u)] to mean that each of the constitutional provisions referred to in the section is to have the same effect in Guam as it would have in a state of the United States. Thus, the first nine amendments of the Constitution are made directly applicable to federal prosecutions in the territory, but are made applicable to prosecutions by the territorial government only to the extent that the rights guaranteed by these amendments are incorporated within the meaning of the [Due Process Clause] of the Fourteenth Amendment."), *disapproved on other grounds by United States v. Frame*, 454 F.2d 1136, 1138 (9th Cir. 1972); *L. Offs. of Phillips & Bordallo, P.C. v. Leon Guerrero*, Civil Case No. 22-00020, 2023 WL 5075374, at *6 (D. Guam Aug. 9, 2023) ("If the Due Process clauses of the Fifth and Fourteenth Amendments were already extended to Guam in their entirety through subsection (e), Congress would have repeated itself by enacting subsection (u). The canon against surplusage thus dictates that subsections (e) and (u) must constitute different rights. . . . [T]he right found in subsection (e) must then be local. . . . [Section] 1421b(e) only applies on Guam and is concerned with protecting persons against a local government . . . ."). The *Guerrero* decision "undermines the central purpose of state constitutional adjudication: preserving the independence of state law, consistent with federal 'floors' of civil rights." *Developments in the Law – The Interpretation of State Constitutional Rights*, 95 Harv. L. Rev. 1324, 1460 (1982); *Hendrickson v. Reg O Co.*, 657 F.2d 9, 15 n.5 (3d Cir. 1981) (observing that although "[i]t might be argued that since the Virgin Islands is not a state, but a territory, the notion of interstate federalism is not a pertinent consideration," where Congress provides by statute that a territory should be treated as a state, this indicates the same principles should apply to it as they would to a state).

### d. We hold that *Guerrero* is unsupported by law

**[50]**    The *Guerrero* court was simply wrong.  Chief Justice Siguenza was right when he wrote for a majority of this court that "[d]espite the similarity of the two provisions, this court can reach its own conclusions on the scope of the protections of [the Organic Act Bill of Rights] and may provide broader rights than those which have been interpreted by federal courts under the United States Constitution."  *People v. Guerrero*, 2000 Guam 26 ¶ 22.

## D. Title 48 U.S.C.A. § 1421b(h)'s Prohibition of Cruel and Unusual Punishments Should Not Be Interpreted in Lockstep with the Eighth Amendment

### 1. The Eighth Amendment

**[51]**    The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  "The Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.'"  *Miller*, 567 U.S. at 469 (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)).  That right "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned' to both the offender and the offense."  *Id.* (quoting *Roper*, 543 U.S. at 560).  "[T]he concept of proportionality is central to the Eighth Amendment."  *Id.* (quoting *Graham*, 560 U.S. at 59).  The concept of proportionality is viewed "less through a historical prism than according to 'the evolving standards of decency that mark the progress of a maturing society.'"  *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).

**[52]**    The Supreme Court of the Commonwealth of the Northern Mariana Islands ("CNMI") has aptly summarized this jurisprudence:

> To determine whether a punishment is cruel and unusual, we must look to "'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle*, 429 U.S. at 102 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).  We do so because what constitutes cruel and unusual punishment is not simply illustrative but involves a "moral judgment." *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008).

"The standard itself remains the same, but its applicability must change as the basic mores of society change." *Id.* (Burger, C.J., dissenting) (quoting *Furman v. Georgia*, 408 U.S. 238, 382 (1972)).

The Eighth Amendment, which includes the Cruel and Unusual Punishment Clause, forbids the imposition of "inherently barbaric punishments." *Graham*, 560 U.S. at 59. The Clause calls attention to the indispensable duty of the government to respect human dignity even of those who are convicted with atrocious crimes. *Id.* The greater part of American jurisprudence on the Cruel and Unusual Punishment Clause, however, does not involve punishments that are barbaric, but rather those that are disproportionate to the crime. *Id.*

Justice requires that imposition of punishment be "graduated and proportioned" to the crime. *Weems*, 217 U.S. at 367. Indeed the constitutional protection of the Eighth Amendment does not necessitate strict proportionality between crime and punishment, but "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in judgment) (quoting *Solem v. Helm*, 463 U.S. 277, 288, 303 (1983)).

*Commonwealth v. Yu Qun*, 2016 MP 19 ¶¶ 9–11.

[53]    United States Supreme Court decisions provide two "strands" of precedent where disproportionate sentences may violate the Eighth Amendment. "The first has adopted categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty." *Miller*, 567 U.S. at 470 (citation omitted); *see also, e.g.*, *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (imposing death penalty on defendant with severe intellectual disability violates Eighth Amendment). The second line of precedents "have prohibited mandatory imposition of capital punishment," instead "requiring that sentencing authorities consider the characteristics of a defendant and the details of his offense before sentencing him to death." *Miller*, 567 U.S. at 470. As the Hawai'i Intermediate Court of Appeals has explained:

*Graham* noted that life without parole and the death penalty share characteristics that are shared by no other sentences and that life without parole is especially harsh on juveniles who will almost inevitably spend more time in jail than adults. *Miller*, 567 U.S. at 474–75 (citing *Graham*, 560 U.S. at 69–70). The Court in death penalty cases requires that "capital defendants have an opportunity to advance, and the judge or jury a chance to assess, any mitigating factors, so that the death penalty is

> reserved only for the most culpable defendants committing the most serious offenses." *Id.* at 475–76. The Court concluded that a similar rule, permitting the sentencer to consider the mitigating factors associated with juvenile offenders who have committed homicides, "should apply when a juvenile confronts a sentence of life (and death) in prison." *Id.* at 476–77.

*State v. Dat Minh Tran*, 378 P.3d 1014, 1019 (Haw. Ct. App. 2016). Thus, in *Miller*, the U.S. Supreme Court held that mandatory LWOP for juveniles sat at "the confluence of these two lines of precedent," which required "individualized consideration before sentencing a juvenile to life imprisonment without possibility of parole." 567 U.S. at 470, 480.

[54]     The U.S. Supreme Court conducts its "evolving standards of decency" analysis by surveying American society; it "compares each state's most reliable 'objective indicia' of societal values, which is usually comprised of state legislative and state jury sentencing data, to determine whether a national consensus opposes the application of a specific punishment upon a particular class of defendants." Cristina M. Quiñones-Betancourt, *When Standards Collide: How the Federal Death Penalty Fails the Supreme Court's Eighth Amendment "Evolving Standards of Decency" Test When Applied to Puerto Rican Federal Capital Defendants*, 23 Cornell J.L. & Pub. Pol'y 157, 161 (2013) (citing *Roper*, 543 U.S. at 567).

### 2. Federal precedent is highly persuasive, but we can depart from federal constitutional principles for compelling reasons

[55]     In their initial brief, the People argued that "[s]ince the U.S. constitution does not prohibit mandatory LWOP sentences for 20- or 21-year-olds, neither does the Organic Act." Appellee's Br. at 14. The People attempted to distinguish Adriatico's reliance on the Washington Supreme Court's decision in *In re Monschke*, 482 P.3d 276, 283 (Wash. 2021) (en banc), by arguing that that court "was free to interpret the state constitution to allow young adult defendants originally sentenced to LWOP to have an opportunity to be resentenced. Federal precedent, in contrast,

restrains Guam courts in this regard." Appellee's Br. at 14. Yet after being asked to brief whether

the Ninth Circuit's *Guerrero* decision was supported by law, the People now argue:

> The Organic Act of Guam creates two methods for analysis of "cruel and
> unusual punishment". The first is under 48 U.S.C. § 1421b(h) . . . . The second is
> under 48 U.S.C. § 1421b(u), which extends the provisions of the Eighth
> Amendment to Guam such that it shall have the same force and effect as in the
> United States or in any State of the United States.

Appellee's Suppl. Br. at 11.

[56]    We are not constrained by federal precedent in interpreting subsection (h). Having found

that the rights established in the federal Constitution are not a ceiling beyond which we cannot

exceed when interpreting the Organic Act Bill of Rights, we must still determine whether to

interpret subsection (h) differently than the Eighth Amendment. Even before *Guerrero*, this court

reached decisions where analysis of an alleged violation of a defendant's rights had a single

inquiry. *See People v. Chargualaf*, 2001 Guam 1 ¶¶ 12–27 (relying on federal precedent to find

no violation of Fourth Amendment); *People v. San Nicolas*, 2001 Guam 4 ¶¶ 8–28 (relying on

federal caselaw to find no double jeopardy violation). But several of our decisions illustrate a

sentiment that both litigants and this court felt constrained by *Guerrero*. *Moses*, 2016 Guam 17 ¶

22 ("Moses's call to use the Organic Act as a more protective local constitution is potentially

viable. However, the *Guerrero* ruling narrows the availability of such remedy, making it only

plausible if the language in the Organic Act and Federal Constitution were substantively

different."); *see also* Jeffrey S. Sutton, *State Constitutions in the United States Federal System*, 77

Ohio St. L.J. 195, 201 (2016) (observing that the phenomenon of "lockstepping" occurs because

(1) federal law often is more developed; (2) lawyers too rarely argue their cases based on the text

and history of the state constitutions; and (3) some local laws require lockstepping).

[57]    We hold that courts should "ask[] first whether the right being asserted is protected under the federal constitution.  If it is, then the [Organic Act] claim is not reached.  If it is not, then the [Organic Act] is examined."[12]  *State v. Gomez*, 932 P.2d 1, 6–7 (N.M. 1997) (rejecting prior precedent where state and federal constitution were interpreted in lockstep and if "the federal constitution did not provide . . . protection, we would follow that precedent without interpreting independently the parallel provision of the New Mexico Constitution").  Scholars have called this the "interstitial approach" to state constitutional analysis, which we now adopt.  As explained in a leading article on state constitutional law:

> The interstitial model proposes three questions that the state court should address sequentially when presented with a state constitutional issue.  First, do established principles of federal law dictate a result; that is, does the alleged unconstitutional action fall below a federal floor?  If so, the case can be decided without the elaboration of state constitutional doctrine.  If not, the second question asks what factors, if any, warrant a divergence from federal doctrine.  If the court identifies reasons to diverge, the final question is how to proceed in elaborating the contours of the state constitutional doctrine; specifically, should the court employ a reactive approach, simply tinkering with the available federal doctrine, or should it employ a more self-reliant approach, building state constitutional doctrine for this area independently, without close reference to the federal doctrine?  The answers to these three questions should structure the process by which state courts decide when and how to develop state constitutional law.

*Developments in the Law – The Interpretation of State Constitutional Rights*, *supra*, at 1358–59 (footnotes omitted).

[58]    Here, the established principles of federal law dictate a result—the alleged unconstitutional action does not fall below a federal floor.  The People are correct that "[e]very Circuit to consider this issue has refused to extend *Miller* to defendants who were eighteen or older at the time of their

---

[12] In cases where a statute provides a third layer of protection in addition to the Organic Act Bill of Rights and federal Constitution, courts should begin with the statute. *See Hammonds by Lizama v. Boonprakong*, Civ. Nos. 81-003A, 81-00048A, 1983 WL 30221, at *4 (D. Guam App. Div. Apr. 4, 1983) ("If a case may be resolved on either constitutional or statutory grounds, a court should avoid the constitutional issue if a statutory disposition is possible." (citing *Harris v. McRae*, 448 U.S. 297, 306–07 (1980); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring))), *aff'd sub nom. Awa v. Guam Mem'l Hosp. Auth.*, 726 F.2d 594 (9th Cir. 1984).

offenses." *Cruz v. United States*, 826 F. App'x 49, 52 n.1 (2d Cir. 2020) (citing *Wright v. United States*, 902 F.3d 868, 872 (8th Cir. 2018); *In re Frank*, 690 F. App'x 146 (5th Cir. 2017) (per curiam); *Melton v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1234, 1235, 1237 (11th Cir. 2015); *United States v. Marshall*, 736 F.3d 492, 500 (6th Cir. 2013); *United States v. Dock*, 541 F. App'x 242, 245 (4th Cir. 2013) (per curiam)).

[59]     We must decide what factors, if any, warrant a divergence from federal doctrine.  The New Mexico Supreme Court has found that three grounds may justify departing from federal jurisprudence: "(1) the federal analysis is flawed or undeveloped; (2) structural differences exist between federal and state government; or (3) distinctive state characteristics exist that would support the departure." *State v. Crane*, 2014-NMSC-026, ¶ 15, 329 P.3d 689.  We find these grounds persuasive but not necessarily exhaustive.  "Because some of these factors will be present in virtually every case . . . [this Court] weigh[s] the relevant considerations in the case at hand to determine whether they favor elaboration of state constitutional doctrine and to identify the factors deserving the greatest attention in that elaboration."  *Id.* (alterations in original) (quoting *Developments in the Law – The Interpretation of State Constitutional Rights*, *supra*, at 1359).

[60]     We conclude certain distinct characteristics of Guam to be adequate grounds upon which to depart from federal jurisprudence and elaborate on our cruel-and-unusual-punishments jurisprudence regarding mandatory LWOP sentences.  In their supplemental brief, the People argue that "the Guam Bill of Rights [could] be interpreted under the unique legal tradition of Guam, which was greatly influenced by Spanish Civil Law, and later modified by its adoption of local codes modelled on the California codes [which were also greatly influenced by Spanish Civil Law]." Appellee's Suppl. Br. at 10.  We do not disagree that Guam has a unique legal tradition, but across the territory acquired by the United States after the Spanish-American War, references

to "Spanish Civil Law" served as a pretext to avoid trial by jury. Katherine Unterman, *Trial Without Jury in Guam, USA*, 38 Law & Hist. Rev. 811, 819–21 (2020) ("[J]ustifying the lack of jury trials by pointing to Guam's Spanish heritage was disingenuous, as in many other ways the American colonial administration was trying to erase the island's cultural traditions. . . . Dislike of juries, racism against local populations, and the desire for centralized governance all pointed in the same direction, each reinforcing the other."); Stanley K. Laughlin, Jr., *The Law of United States Territories and Affiliated Jurisdictions* 126 (1995) ("To the extent that the jury system is designed to interpose community sentiment between government and citizenry, it would have been unthinkable . . . to allow members of the indigenous territorial population to serve as jurors or grand jurors."). Thus, "United States colonial officials' ostensible respect for Guam's heritage actually undermined locals' self-determination and agency." Unterman, *supra*, at 819.

[61] We conclude that the Guam Bill of Rights should be interpreted under the unique legal tradition of Guam, but rather than focusing on the "Spanish Civil Law" that was a pretext for the "the racialization of Chamorus," *id.* at 812, the focus should be placed on the people of Guam, and that "[f]rom the very start of American [naval] occupation, . . . the people of Guam pressed for greater rights and self-determination," *id.* at 822.[13] The Organic Act Bill of Rights was sought by the people of Guam because "[t]hey wanted local agency, rather than governance by naval officers and faraway Washington bureaucrats." *Id.* at 827.

[62] We hold that courts should construe the term "cruel and unusual punishments" as used in the Guam Bill of Rights with due regard for the historical, governmental, and cultural values of

---

[13] As early as 1901, citizens of Guam petitioned the United States Congress, stating that "fewer permanent guarantees of liberty and property rights exist now than when under Spanish dominion. . . . We believe ourselves fully justified in asking relief from a system of government that subjects a thoroughly loyal people to the absolute rule of a single person." Katherine Unterman, *Trial Without Jury in Guam, USA*, 38 Law & Hist. Rev. 811, 822 (2020) (footnote omitted). In 1937, Baltasar J. (B. J.) Bordallo testified before Congress that "we are only concerned to the extent that our people be granted citizenship rights as have the people of Hawaii, Alaska, Puerto Rico, and the Virgin Islands." *Id.* at 823–24 (quoting Testimony of Bordallo, *Citizenship for Residents of Guam*, 8).

Guam. *See Tom*, 533 F.2d at 1104 n.5. This term should not always be given the same meaning as it represents under the U.S. Constitution. As noted by Cristina M. Quiñones-Betancourt, writing on the constitutionality of the federal death penalty as applied to Puerto Rican defendants:

> Although members of the [U.S. Supreme] Court have considered data from Washington D.C. when conducting their evolving standards of decency analyses, no member of the Court has ever included objective indicia from Puerto Rico despite the fact that Congress and the American courts treat Puerto Rico as a state when it is convenient.

Quiñones-Betancourt, *supra*, at 170 (citations omitted). She argues persuasively that where a territory's objective indicia are omitted from the Supreme Court's evolving standards of decency test, an American national consensus should not be imposed on the territory:

> The omission of Puerto Rico's objective indicia from the application of the Supreme Court's evolving standards of decency test implies that Puerto Rico is so fundamentally different from the states that its objective indicia cannot be used to determine the American national consensus. Therefore, objective indicia gathered from the states cannot be used to determine a national consensus that reflects a Puerto Rican consensus because a Puerto Rican consensus can only be derived from residents of Puerto Rico.

*Id.* at 171; *cf. Fitisemanu*, 1 F.4th at 880 ("I agree with the representatives of the American Samoan government that 'an extension of birthright citizenship without the will of the governed is in essence a form of "autocratic subjugation" of the American Samoan people.' While I am sympathetic to Plaintiffs' desire for citizenship, to accept their position would be to *impose* citizenship over the expressed preferences of the American Samoan people. Such a result would be anomalous to our history and our understanding of the Constitution." (emphasis added) (footnote omitted)); *Wabol v. Villacrusis*, 958 F.2d 1450, 1461 (9th Cir. 1990) ("We conclude that Wabol has carried its burden of demonstrating that this particular constitutional guarantee would be impractical and anomalous in the Commonwealth and therefore should not be *imposed*." (emphasis added)).

**[63]**     Given that no federal decision has considered Guam when evaluating whether mandatory LWOP for youthful offenders violates society's evolving standards of decency, we find Guam's distinctive characteristics support departure from that federal precedent.

**[64]**     Having identified a reason to diverge, we must now decide the contours of the Organic Act doctrine—should we simply tinker with the available federal doctrine, or should we build an Organic Act doctrine for cruel and unusual punishments independently?  We do not find the motivating ideas behind the federal "evolving standards of decency test" to be inherently flawed. But to determine whether Guam's imposition of mandatory LWOP violates the "basic mores of society," *see Kennedy*, 554 U.S. at 419, logically, "society" must be defined to include Guam.

**[65]**     We hold that the proper legal standard to be applied is to determine whether mandatory LWOP for youthful offenders violates "the evolving standards of decency that mark the progress of a maturing society." *See Estelle*, 429 U.S. at 102 (citations omitted).  This is done by surveying objective indicia of societal values to determine whether a consensus opposes the application of a specific punishment upon a particular class of defendants. *See* Quiñones-Betancourt, *supra*, at 161.  Remand is appropriate for the trial court to survey the "objective indicia" of societal values.[14] On the record before us now, we express no opinion on how to properly define the boundaries of society, other than it must include Guam.[15]

---

[14] A good starting point would be the definition of "Youth offender" found at 9 GCA § 83.15(d), which both parties argue represents objective indicia of Guam's societal values.

[15] We do note, however, that "[t]wenty-two States and the District of Columbia do not mandate life without parole in any circumstance.  Of the remaining twenty-eight States, only twelve . . . mandate life without parole." *Commonwealth v. Mattis*, 224 N.E.3d 410, 426–27 (Mass. 2024) (footnotes omitted).  The statutes in at least two of those States that mandate LWOP for youthful offenders, including Hawaiʻi, provide an opportunity to avoid the mandatory nature of the sentence. *Id.* at 427 n.27.  Of those twelve states that have statutes authorizing mandatory LWOP for youthful offenders, the courts of at least three states have found those statutes unconstitutional to some extent. *Id.* at 428; *In re Monschke*, 482 P.3d 276, 287 (Wash. 2021) (en banc); *People v. Parks*, 987 N.W.2d 161, 182 (Mich. 2022).  Additionally, it appears that neither CNMI, Marshall Islands, Palau, nor the Federated States of Micronesia mandate an LWOP sentence for any type of murder conviction. *See* 6 N. Mar. I. Code § 1101 (2024); 31 MIRC §§ 6.04, 6.13 (Marsh. Is.); 17 PNCA §§ 1702, 1209 (Palau); 11 F.S.M.C. §§ 606, 1204 (Micr.).

**E. We Remand for Further Proceedings, with Instructions to Appoint Counsel and Hold an Evidentiary Hearing on How Evolving Science on Brain Development Applies to an Emerging Adult and to Adriatico's Specific Circumstances**

[66] Adriatico asks for a determination that the Constitution and Organic Act require "that the trial court consider his status as a youthful offender along with evidence regarding his immaturity at the time of the offense, subjection to negative peer pressure and impaired decision making ability." Appellant's Br. at 10. He maintains that the trial court did not entertain his arguments about cruel and unusual punishment, "finding that they are not appropriate for consideration." *Id.* He requests a remand to the trial court to argue that mandatory LWOP for youthful offenders is unconstitutional, inorganic, or both. *Id.* We agree with Adriatico that the trial court failed to entertain his cruel-and-unusual-punishment claims, and that remand for consideration under the legal standards articulated in this opinion is appropriate.

[67] Due process provides for a right to counsel in post-conviction proceedings when "fundamental fairness necessitates the assistance of a trained advocate." *United States v. Palomo*, 80 F.3d 138, 141 (5th Cir. 1996) (citations omitted). If a Guam prisoner is housed in a federal penitentiary with allegedly no access to Guam law materials, and the court determines the claims raised are meritorious enough to hold a hearing, fundamental fairness demands the assistance of a trained advocate. Although the U.S. Supreme Court has not articulated the source of the rule, the Constitution requires "meaningful access to the courts," such as by "providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Lewis v. Casey*, 518 U.S. 343, 346, 351 (1996) (quoting *Bounds v. Smith*, 430 U.S. 817, 828 (1977)). Adriatico seems to have received neither, likely violating his right to due process. Generally, the remedy for denial of counsel in such a case is remand for further proceedings, including appointment of post-

conviction counsel, allowing post-conviction counsel to supplement Adriatico's *pro se* motion, and conducting a hearing.  *See, e.g.*, *People v. Chalchi-Sevilla*, 2019 COA 75, ¶ 27.

[68]    We remand with instructions "for further postconviction proceedings to give [Appellant] the opportunity to consult with counsel about his constitutional claims and to develop and present evidence to the trial court, with assistance of counsel, demonstrating how the evolving science on juvenile maturity and brain development applies to an emerging adult and to the [Appellant's] specific circumstances."  *See People v. House*, 2021 IL 125124, ¶ 22.  After conducting an evidentiary hearing, the trial court is tasked with deciding whether imposition of mandatory LWOP sentences for youthful offenders violates Guam's evolving standards of decency that mark the progress of a maturing society.  In deciding this issue, it is within the trial court's discretion to order briefing from the parties or hold a hearing to establish the 'objective indicia' of societal values.  Should the trial court decide mandatory LWOP sentences for youthful offenders are inorganic because they violate Guam's evolving standards of decency, the court shall exercise its power under 8 GCA § 120.46 to correct illegal sentences.  In such a scenario, the trial court must follow the mandate that "a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty."  *Cf. Miller*, 567 U.S. at 483 (applying this standard to juveniles).

## V.  CONCLUSION

[69]    Adriatico has abandoned appellate review of his motion for compassionate release on COVID-19 grounds.  We correct Adriatico's two LWOP sentences for attempted aggravated murder as they were illegal under the law at the time of his conviction.  We **VACATE** in part the judgment in CF0116-84.  On remand, the Superior Court shall enter a new judgment correcting these sentences as discussed above.

**[70]**     We hold that the Ninth Circuit's decision in *Guam v. Guerrero* was unsupported by law, and we can interpret the Organic Act to provide more protection than the Eighth Amendment. We also hold that § 1421b(h) of the Organic Act Bill of Rights should not be interpreted in lockstep with the Eighth Amendment. The proper legal standard to apply to the claim that a mandatory LWOP sentence is inorganic is to apply a modified version of the "evolving standards of decency" test that includes objective indicia of societal values from Guam.

**[71]**     We remand with instructions that Adriatico be appointed counsel. He should be able to consult counsel about his Organic Act claims and to develop and present evidence to the trial court, with assistance of counsel, demonstrating how the evolving science on juvenile maturity and brain development applies to an emerging adult and to Adriatico's specific circumstances. After hearing, the trial court shall decide whether a societal consensus opposes the application of this specific punishment upon this class of defendants.

**[72]**     We **AFFIRM** in part, **REVERSE** in part, and **REMAND** to the Superior Court for further proceedings not inconsistent with this opinion.

| /s/ | /s/ |
|:---:|:---:|
| F. PHILIP CARBULLIDO | KATHERINE A. MARAMAN |
| Associate Justice | Associate Justice |

/s/
ROBERT J. TORRES
Chief Justice